1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9

10

MICHAEL M. MUNYWE,

11

Plaintiff,

12

v.

13

SCOTT R. PETERS, *et al.*,

14

Defendants.

CASE NO. 3:21-cv-05431-BJR-JRC

REPORT AND RECOMMENDATION

NOTED FOR: January 27, 2023

15
16

This matter is before the Court on referral from the District Court and on a motion for

17

summary judgment filed by defendants. *See* Dkt. 63.

18

Plaintiff, who is incarcerated at the Washington State Penitentiary ("WSP"), brings suit

19

under 42 U.S.C. § 1983 alleging various King County law enforcement officials and agencies

20

violated his constitutional rights during his pretrial detention and by mishandling evidence. After

21

the District Court dismissed certain claims and certain defendants, the case has proceeded toward

22

trial on plaintiff's claims that certain defendants violated his constitutional rights when they

23

conducted a cross-gender search of him while he was nude.

24

Defendants have filed a motion for summary judgment arguing that plaintiff has not alleged a viable claim and cannot show a constitutional violation occurred during the search. Defendants have provided plaintiff with a notice of their dispositive motion, plaintiff has responded, and defendants have replied.

After reviewing the motion and the relevant record, the Court concludes that plaintiff has failed to rebut defendants' showing that they are entitled to summary judgment as to his Fourth, Fifth, and Fourteenth Amendment claims. Plaintiff has not established that the search of his person violated the Fourth Amendment because the search itself was reasonable and exigent circumstances necessitated the need for a cross-gender search. Further, plaintiff has not established that defendants violated his Fifth Amendment right against compelled self-incrimination because plaintiff was not subjected to coercive interrogation techniques, nor did he provide a confession, let alone a compelled one. Additionally, plaintiff has failed to establish that defendants violated his Fourteenth Amendment rights because there is no evidence he was subjected to disparate treatment based on his race or national origin or that the search of his person was conducted for punitive reasons. Accordingly, the Court recommends that defendants' motion for summary judgment be granted and plaintiff's claims be dismissed with prejudice.

## BACKGROUND

### I.    Procedural History

Plaintiff, proceeding *pro se* and *in forma pauperis* ("IFP"), filed this action in June 2021, raising claims related to his detention on the evening of November 21, 2018 on suspicion of sexual assault of a minor and subsequent conviction for second-degree rape and unlawful imprisonment. *See* Dkt. 7. In his initial complaint, plaintiff sued: (1) Scott R. Peters, a prosecutor; (2) Julie Dier, a detective; (3) Malerie Ramos, a crime scene technician; (4) William

Muse, a detective; (5) the City of Tacoma; (6) Jennifer Hayden, a DNA analyst; and (7) Washington State Patrol Crime Laboratory ("WSPCL"). *See* Dkt. 52 at 3. Plaintiff alleged that: (1) certain defendants conspired to falsify evidence and suppress exculpatory DNA evidence; and (2) other defendants conducted a cross-gender search of him while he was nude. *Id*. at 1–2.

After certain defendants filed motions to dismiss (*see* Dkts. 29, 31), because those motions did not involve all defendants and all claims, the Court determined that a more appropriate way to address the issues was to screen the entire complaint pursuant to 28 U.S.C. § 1915A(a). *See* Dkt. 52. The Court determined that many of plaintiff's claims were deficient, ordered him to amend his complaint, and provided detailed instructions on how to do so. *Id*.

On December 22, 2021, plaintiff filed an amended complaint but did not follow the Court's instructions. *See* Dkt. 53. In the subsequent order directing plaintiff to file a second amended complaint, the Court noted that the first order to amend had instructed plaintiff to attach no more than 5 continuation sheets to his complaint. Dkt. 54 at 1. Instead, plaintiff had attached 19 continuation sheets. Dkt. 53. The first order to amend also instructed plaintiff to "not unjustifiably expand 'the scope of the case by alleging new unrelated claims or parties in the amended complaint.'" Dkt. 52 at 20. In the second order to amend, the Court detailed the ways in which plaintiff had not complied with that instruction either. Dkt. 54 at 3–4.

Plaintiff filed a second amended complaint that attached 17 continuation pages and is substantively similar to the first amended complaint. Dkt. 56. The second amended complaint names the following defendants: (1) Peters; (2) Mary Robnett, supervisory prosecutor; (3) Prosecutor's Office; (4) Pierce County; (5) Hayden; (6) Dier; (7) Muse; (8) Ramos; (9) City of Tacoma; and (10) Tacoma Police Department. *Id.* at 5–6.

On January 24, 2022, the Court issued a Report and Recommendation ("R&R") recommending *sua sponte* dismissal of certain claims and allowing other claims to proceed. Dkt. 58. Specifically, the Court recommended that plaintiff be allowed to proceed on his Fourth, Fifth, and Fourteenth Amendment claims for damages in Count IV against defendants Muse, Dier, and Ramos. *Id*. The Court also recommended that plaintiff be allowed to proceed on his Fourth Amendment claim for damages in Count IV against defendant City of Tacoma. *Id*. The Court recommended dismissal without prejudice but without leave to amend of the remaining claims in the second amended complaint, as well as dismissal of plaintiff's First Amendment and RLUIPA claims. *Id*. Finally, the Court recommended that defendants Peters, Hayden, Robnett, Pierce County Prosecutor's Office, Pierce County, and Tacoma Police Department be terminated as parties. *Id*.

Plaintiff filed objections on February 2, 2022. Dkt. 60. On July 27, 2022, the District Court issued its Order adopting the R&R. Dkt. 92. Specifically, the District Court dismissed without prejudice Counts I, II, and III of plaintiff's second amended complaint; dismissed plaintiff's Fifth and Fourteenth Amendment claims against defendant City of Tacoma; and dismissed as parties defendants Robnett, Pierce County Prosecutor's Office, Pierce County, Hayden, and Peters. Dkt. 92.

Before the District Court issued its Order adopting the R&R, the parties filed several motions. Defendants City of Tacoma, Muse, Dier, and Ramos filed a motion for summary judgment on May 9, 2022. Dkt. 63. Defendant Hayden filed a motion for summary judgment on May 16, 2022. Dkt. 71. Because the District Court dismissed defendant Hayden as a party in this action, *see* Dkt. 92, on October 25, 2022, the Court dismissed as moot her motion for summary

1   judgment, *see* Dkt. 103. As such, the Court herein addresses only the motion for summary

2   judgment filed on May 9, 2022. Dkt. 63.

3   **II.     Allegations in the Complaint**

4        As directed by the District Court, plaintiff is proceeding with his Fourth, Fifth, and

5   Fourteenth Amendment claims against defendants Muse, Dier, and Ramos, and his Fourth

6   Amendment claim against defendant City of Tacoma. *See* Dkt. 92 at 6. The allegations in the

7   second amended complaint with respect to these claims are as follows.

8        Plaintiff alleges that, on November 22, 2018, defendants Muse, Dier, and Ramos violated

9   his constitutional rights during an interview in the Tacoma Police Department. Dkt. 56 at 20. In

10  support, plaintiff alleges that defendants "disrespectfully exposed [his] nudity" in order to

11  "psychologically and emotionally torture, humiliate and embarrass" him while taking

12  photographs of him and collecting evidence from him following his arrest. *Id*. Defendant Muse

13  "commanded [him] to the wall" and directed defendant Ramos to start taking continuous

14  photographs of plaintiff as he undressed and while defendant Dier "sat closely comfortably

15  viewing the action and watching" plaintiff. *Id*. Defendants specifically directed plaintiff to "stand

16  by the wall, remove that jacket, . . . lift up your shirt, go ahead remove those pants, remove your

17  underwear, drop it down, split your legs apart, the testicles, etc. etc." *Id*. at 21. While plaintiff

18  was undressing, defendant Ramos "took a series of many many unnecessary photographs" that

19  had "no legal purpose whatsoever" because "there was another video camera that was recording

20  the whole episode." *Id*. Plaintiff alleges that these defendants so acted "for their personal

21  enjoyment and fun." *Id*. He also claims that the presence of defendants Ramos and Dier—both

22  female—was unnecessary since male officers and technicians were available and within the

23

24

1    vicinity. *Id*. at 20–21. Plaintiff adds that defendants interrogated him while nude and

2    embarrassed in front of females "to compel a confession." *Id*. at 21.

3        Plaintiff also alleges that defendant City of Tacoma's "policy, lack of policy, custom,

4    norms or failure to train properly" caused defendants Muse, Dier, and Ramos to violate

5    plaintiff's constitutional rights during the search of plaintiff on November 22, 2018. *Id*. at 24.

6        Plaintiff seeks damages, declaratory, and injunctive relief. Dkt. 56 at 26; 28–29.

7    **III.    Defendants' Evidence**

8        In support of their motion for summary judgment (Dkt. 63), defendants Muse, Dier, and

9    Ramos have submitted declarations, as well as declarations from Paul DePoister, the forensics

10   manager for the Tacoma Police Department; and Jennifer Taylor, a deputy Tacoma city attorney

11   and defendants' counsel. Dkts. 64–68. In addition, defendants have filed a video of plaintiff's

12   interview by defendants Dier and Muse and the subsequent evidence collection procedure

13   involving defendant Ramos. *See* Dkt. 69.

14       This case arises out of the Tacoma Police Department's investigation of a rape case. Dkt.

15   63 at 2. On November 21, 2018, Tacoma Police Officers Jeff Thiry and Brian She were

16   dispatched to Tacoma Avenue South for an unknown trouble call. *Id*. Defendants initially note

17   that the instant case is related to *Munywe v. Dier, et al.*, No. 3:21-cv-5218-BJR, a case in which

18   plaintiff asserted claims against the arresting officers and defendants Dier and Muse for the

19   conditions of his pre-interview detention. Dkt. 63 at 2 n.1. As such, the background information

20   relating to the contact with and arrest of plaintiff on November 21, 2018, is more fully set forth

21   in that case. *Id*.

22       According to the 911 dispatcher, the caller—later identified as 15-year-old female, AG—

23   was pretending to be talking to her mother so that plaintiff would not know she was calling 911,

24

REPORT AND RECOMMENDATION - 6

1    and described her clothing and location. *Id*. When the dispatcher asked if someone was trying to

2    hurt her, AG responded in the affirmative. *Id*. The officers dispatched to the area conducted a

3    search and observed AG and a male, later identified as plaintiff, walking on South 9th Street. *Id*.

4    The officers contacted the parties and AG reported that plaintiff, who was unknown to her, had

5    pulled her into an alley, raped her, and began following her thereafter. *Id*. at 2–3. AG was visibly

6    distraught, but plaintiff denied that anything had occurred. *Id*. at 3. When the officers noted

7    plaintiff's accent, he informed them he was from Kenya. *Id*. at 3 n.2. The officers further

8    observed that the fly to plaintiff's pants was disheveled. *Id*. at 3. Officer Thiry transported

9    plaintiff to Tacoma Police Department headquarters and placed him in a holding cell to await

10   further investigation and questioning by detectives. *Id*. Officer She transported AG to Mary

11   Bridge Children's Hospital for a sexual assault examination and subsequently to the Child

12   Advocacy Center for a forensic interview. *Id*. at 3 n.3.

13       While plaintiff was in the detention cell, detectives were actively investigating the

14   allegations against plaintiff. *Id*. While they awaited the results of the forensic examination and

15   interview of AG, defendant Muse, the lead investigator, prepared an affidavit for a search

16   warrant for plaintiff's person and clothing. *Id*. Based on the information obtained during the

17   investigation, detectives anticipated finding trace DNA evidence from AG on plaintiff's clothing

18   and penis. *Id*. As a result, the search warrant contained requests for a search of plaintiff's person,

19   including his pubic region and a swabbing of his genitals, as well as collection of plaintiff's

20   pants and underpants. *Id*. at 3–4.

21       After defendant Muse received the information from AG's forensic interview, including

22   additional details regarding plaintiff's sexual assault of AG, he contacted the on-call judge from

23

24

1    the Pierce County Superior Court and was sworn in. *Id*. at 4. Judge Shelly Speir then issued the

2    search warrant at 1:18 a.m. on November 22, 2018. *Id*.

3         Back at the Tacoma Police Department headquarters, plaintiff was escorted from the

4    detention area to an interview room. *Id*. According to defendant Muse, when plaintiff entered the

5    interview room for interrogation, defendant Muse advised him that the room was equipped with

6    audio and video recording equipment that was already activated for the interview. Dkt. 65 at 6.

7    Plaintiff looked at the wall where the camera was located, understood the interview was being

8    recorded, and did not object or protest. *Id*. Present for the interview were plaintiff and defendants

9    Muse and Dier. *Id*.

10        Defendant Muse then removed plaintiff's handcuffs, inspected plaintiff's wrists and

11   noticed no injuries, and provided plaintiff with a cup of water. *Id*. Defendant Muse then advised

12   plaintiff of his *Miranda* rights. *Id*. He placed the advisement of rights form on the table in front

13   of plaintiff and positioned it so that plaintiff could read it silently while defendant Muse read it

14   aloud. *Id*. at 6–7. At the end of each warning on the form, defendant Muse confirmed that

15   plaintiff understood. *Id*. After he read aloud the entire form, defendant Muse asked plaintiff if he

16   understood all of his rights. *Id*. Plaintiff indicated that he did, agreed to waive his rights and to

17   speak with detectives without an attorney present, and signed the form. *Id*.

18        Defendant Muse immediately noticed plaintiff's accent and initiated a conversation with

19   plaintiff about his background. *Id*. Plaintiff told him he was born and raised in Kenya and had

20   moved to the United States in 2014. *Id*. Defendant Muse wanted to make sure plaintiff would be

21   able to converse comfortably in English, so asked him about his proficiency in the language. *Id*.

22   Plaintiff indicated that he learned English while in elementary school in Kenya. *Id*. After they

23

24

1   discussed further various topics, defendant Muse was satisfied that plaintiff could comprehend

2   English and would be able to communicate with detectives. *Id*.

3          Turning to the events of November 21, 2018, plaintiff admitted to having consumed a

4   pint of vodka in the afternoon and told detectives that he met AG while walking through the

5   campus of Bates Technical College. Dkt. 63 at 4. He admitted to hugging AG over her clothes,

6   but denied any other physical contact with her, including any sexual contact. *Id*. After further

7   questioning about the details of his contact with AG, plaintiff never admitted to any physical

8   contact other than the hugging. Dkt. 65 at 8. Defendants Muse and Dier did not raise their voices

9   or use profanities or threats during the interview. *Id*. They then terminated that line of

10  questioning and left the interview room. *Id*. at 8.

11         At that point, defendants Muse and Dier called for Forensics to come to the interview

12  room for collection of evidence authorized by the warrant. Dkt. 63 at 5. Subsequently,

13  defendants Muse and Dier came back to the interview room and defendant Muse read the search

14  warrant to plaintiff. *Id*. at 4. Specifically, defendant Muse advised plaintiff that the warrant

15  authorized the retrieval of DNA from plaintiff's person, the taking of photographs of plaintiff,

16  and the collection of plaintiff's pants and underpants. Dkt. 63 at 4; Dkt. 67 at 4.

17         The forensics technician, defendant Ramos, arrived at the interview room at

18  approximately 2:42 a.m. Dkt. 63 at 5. She was the sole forensics technician on duty at that time

19  of day. *Id*. There were no male technicians on duty at that hour. *Id*. A male crime scene

20  technician had left his shift that night on time at 2:00 a.m., and no other male technician was

21  scheduled to be on shift until 8:00 a.m. the following day. Dkt. 68 at 4.

22         According to defendant Ramos, the detectives explained to plaintiff who she was and

23  what the purpose was for her coming into the room. Dkt. 66 at 3. She wore gloves throughout the

24

REPORT AND RECOMMENDATION - 9

1 entire process and explained to plaintiff step-by-step each photograph she was taking. *Id*.

2 Defendant Ramos took photographs of certain clothing items, but plaintiff always had some

3 articles of clothing on his body throughout the process. *Id*. She asked him to briefly lower his

4 underpants and took a single photograph of plaintiff's genitals, and then he pulled the underpants

5 back up. *Id*. She ensured plaintiff's face was not in that photograph. *Id*.

6      Defendant Ramos then prepared the swabs for the DNA collection. *Id*. She used a sterile

7 kit, and explained to plaintiff the process beforehand so that he would understand what she

8 would be doing. *Id*. Defendant Ramos asserts that plaintiff did not appear to be confused or

9 evince any noticeable distress or concern. *Id*. She asked him to lower his underpants again so that

10 she could swab his penis. *Id*. When she swabbed his penis, she did so as quickly as possible and

11 without touching plaintiff's body with any part of her body. *Id*. After the DNA collection and

12 pursuant to the warrant, plaintiff's clothing items, namely his underpants and pants, were

13 collected and plaintiff was given a disposable jumpsuit for transport to jail. Dkt. 67 at 4.

14      Defendant Dier, the female detective present for the interview, remained in the room for

15 the search and was present by the door, but primarily looked away while the evidence was

16 collected. Dkt. 67 at 4. Defendant Muse, the male detective present, assisted defendant Ramos

17 with the evidence collection process, but never touched plaintiff. Dkt. 65 at 9. All three

18 defendants—Muse, Dier, and Ramos—assert that, because of the fragile nature of the evidence

19 sought, specifically the biological swab, investigators could not wait until the following day

20 because of the significant risk of destruction or contamination of evidence. Dkt. 63 at 5. Further,

21 defendant Muse declares that "the purpose [of the swab] was to collect any trace DNA evidence

22 belonging to AG. This was especially important if her DNA was found (<u>as it ultimately was</u>)

23

24

1    under the three layers of clothing [plaintiff] was wearing, since he maintained that he had never

2    exposed his genitals to AG or had any contact with her under his clothing." Dkt. 65 at 9.

3        The Pierce County Prosecuting Attorney charged plaintiff with rape in the first degree

4    and kidnapping. *Id*. at 6. Following a jury trial, plaintiff was convicted of rape in the second

5    degree and unlawful imprisonment and sentenced to a term of imprisonment. *Id*. His conviction

6    and sentence have been affirmed by Division II of the Washington State Court of Appeals. *Id*.

7                                    **DISCUSSION**

8        In their motion for summary judgment, defendants argue: (1) plaintiff's claims should be

9    dismissed pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), as they implicate the validity of

10   plaintiff's conviction; (2) plaintiff's Fourth Amendment claim relating to the cross-gender search

11   pursuant to a valid warrant fails because it was reasonable under the circumstances; (3)

12   plaintiff's Fifth Amendment claim fails because there is no evidence plaintiff was coerced into a

13   confession; (4) plaintiff's Fourteenth Amendment claims based on equal protection and

14   substantive due process fail because there is no evidence plaintiff was subjected to disparate

15   treatment or that the search was conducted for punitive reasons; (5) plaintiff's claims against the

16   individual defendants are subject to dismissal on the basis of qualified immunity; and (6)

17   plaintiff's municipal liability claim fails as a matter of law. Dkt. 63. After setting forth the

18   standard for summary judgment, the Court will discuss these arguments in turn.

19   **I.    Legal Standard**

20       "The court shall grant summary judgment if the movant shows that there is no genuine

21   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

22   Civ. P. 56(a). When ruling on a summary judgment motion, the Court must take the evidence in

23   the light most favorable to the nonmoving party and must draw all reasonable inferences in that

24

1   party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once the moving party

2   has carried its burden under Federal Rule of Civil Procedure 56, the party opposing the motion

3   "must do more than simply show that there is some metaphysical doubt as to the material facts."

4   *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

5          The opposing party cannot rest solely on his pleadings but must produce significant,

6   probative evidence in the form of affidavits, and/or admissible discovery material that would

7   allow a reasonable jury to find in his favor. *Anderson*, 477 U.S. at 249–50. Conclusory

8   allegations and mere speculation are not enough to create a genuine issue of material fact. *See,*

9   *e.g.*, *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The

10  purpose of summary judgment "is not to replace conclusory allegations of the complaint or

11  answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871,

12  888 (1990). "If a party fails to properly support an assertion of fact or fails to properly address

13  another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary

14  judgment if the motion and supporting materials—including the facts considered undisputed—

15  show that the movant is entitled to it[.]" Fed R. Civ. P. 56(e)(3). Finally, because plaintiff is *pro*

16  *se*, the Court "must consider as evidence in his opposition to summary judgment all of

17  [plaintiff's] contentions offered in motions and pleadings, where such contentions are based on

18  personal knowledge and set forth facts that would be admissible in evidence, and where

19  [plaintiff] attested under penalty of perjury that the contents of the motions or pleadings are true

20  and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

21          **II.    *Heck* Bar**

22          Defendants argue that plaintiff's claims should be dismissed pursuant to *Heck* because

23  they implicate the validity of plaintiff's convictions for rape in the second degree and unlawful

24

1  imprisonment. In *Heck*, the Supreme Court held that a state prisoner may not seek damages in a

2  § 1983 action where "a judgment in favor of the plaintiff would *necessarily* imply the invalidity

3  of his conviction or sentence," unless "the plaintiff can demonstrate that the conviction or

4  sentence has already been invalidated." *Heck*, 512 U.S. at 487 (emphasis added); *see also Smith*

5  *v. City of Hemet*, 394 F.3d 689, 699 (9th Cir. 2005).

6        Here, in support of their contention that *Heck* bars plaintiff's claims, defendants argue

7  that if the Court were to determine that defendants' collection of photographic and forensic

8  biological evidence was done in violation of plaintiff's constitutional rights, then plaintiff's

9  entire underlying conviction would be invalidated. Dkt. 63 at 10. They further argue that

10  plaintiff's success in this action would create a conflict between civil and criminal judgments and

11  hence would amount to a collateral attack on the state criminal judgment through a federal civil

12  tort action. *Id*. This result, they argue, is the result that the doctrine set forth in *Heck* was

13  designed to avoid. *Id*.

14        Viewing the facts in a light most favorable to plaintiff, the Court finds that plaintiff's

15  claims for damages do not necessarily imply the invalidity of plaintiff's underlying conviction. A

16  judgment in this action would only establish, for example, that plaintiff was unreasonably

17  subjected to a cross-gender search, plaintiff's due process rights were violated, or plaintiff was

18  denied equal protection under the law. Again, for a federal civil rights claim to be barred by

19  *Heck*, it is not enough that the claim cast doubt on a state-court conviction. Rather, *Heck* applies

20  only when success in the § 1983 action would "*necessarily* imply or demonstrate that the

21  plaintiff's earlier conviction was invalid." *Smith*, 394 F.3d at 699 (emphasis added). Even if

22  plaintiff were to establish that a search of his person by a female was unreasonable, the state

23  court could find that it was harmless error to admit the evidence found as a result of the search.

24

1   Because success in this action would not necessarily imply that plaintiff is actually innocent of

2   rape in the second degree and unlawful imprisonment, *Heck* does not require dismissal. *See*

3   *Cunningham v. Gates*, 312 F.3d 1148, 1153–54 (9th Cir. 2002), *as amended on denial of reh'g*

4   (Jan. 14, 2003) ("In evaluating whether claims are barred by *Heck*, an important touchstone is

5   whether a § 1983 plaintiff could prevail only by negating 'an element of the offense of which he

6   has been convicted.'"). Therefore, the Court recommends denying defendants' motion for

7   summary judgment on this ground.

8       **III.**    **Fourth Amendment Claim**

9        Plaintiff alleges that defendants Muse, Dier, and Ramos violated the Fourth Amendment

10   when they subjected him to a compromising cross-gender search while he was nude. Dkt. 56 at

11   20–24. More specifically, he alleges that defendant Muse directed defendant Ramos (a female) to

12   take pictures of him and collect evidence from him while he was nude and while defendant Dier

13   (a female) watched. *See* Dkt. 56 at 20–21. Further, plaintiff alleges that these defendants forced

14   him to assume several compromising positions "for their personal enjoyment and fun." *Id.* at 21.

15   Additionally, plaintiff alleges that male officials were available to conduct the search. *See id.* at

16   20–21. Plaintiff also asserts this claim against defendant City of Tacoma based on allegations of

17   municipal liability. *Id.* at 24.

18        The Fourth Amendment prohibits only unreasonable searches. *Bell v. Wolfish*, 441 U.S.

19   520, 558 (1979); *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988). The reasonableness

20   of the search is determined by the context, which requires a balancing of the need for the

21   particular search against the invasion of personal rights the search entails. *Bell*, 441 U.S. at 558–

22   59 (quotations omitted). Factors that must be evaluated are (1) the scope of the particular

23

24

1    intrusion, (2) the manner in which it is conducted, (3) the justification for initiating it, and (4) the

2    place in which it is conducted. *Id*. at 559 (quotations omitted); *Michenfelder*, 860 F.2d at 332.

3    In analyzing these factors, the cross-gender nature of the search is a critical consideration.

4    *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1143 (9th Cir. 2011). It has long been

5    recognized that "the desire to shield one's unclothed figure from [the] view of strangers, and

6    particularly strangers of the opposite sex, is impelled by elementary self-respect and personal

7    dignity." *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963). The "litany of cases over the last

8    thirty years has a recurring theme: cross-gender strip searches in the absence of an emergency

9    violate an inmate's right under the Fourth Amendment to be free from unreasonable searches."

10   *Byrd*, 629 F.3d at 1146.

11   In *Byrd*, the Ninth Circuit concluded that a cross-gender strip search of a pretrial detainee

12   was an unreasonable incursion of the detainee's Fourth Amendment rights because the methods

13   used—in particular, touching the detainee's genitals and searching inside his anus—were

14   unreasonable. *Id*. at 1142, 1147. The Court confirmed that, "although valid reasons to search the

15   inmates existed generally, there was no justification given for conducting a cross-gender strip

16   search," particularly when the search was not necessitated by an emergency and when other

17   guards of the inmate's same gender were available to conduct the search. *Id*. at 1143.

18   Here, defendants argue that, under the *Bell* factors set forth in *Byrd*, the scope and

19   manner of the collection of evidence during the search of plaintiff was reasonable and, because

20   of exigent circumstances, the cross-gender evidence collection was reasonable and not in

21   violation of the Fourth Amendment. The Court will turn first to the factors articulated in *Bell*

22   before determining whether exigent circumstances were present at the time of the cross-gender

23   search.

24

1    The first two *Bell* factors are (1) the scope of the particular intrusion, and (2) the manner

2    in which the search is conducted. *Bell*, 441 U.S. at 559. Defendants have presented evidence,

3    including the video of the interview and subsequent search, that shows that, while there were

4    multiple photographs taken of plaintiff while he was clothed, only a single photograph was taken

5    of plaintiff's genitals while he briefly lowered his underpants. Dkt. 66 at 3; Dkt. 69. Further,

6    plaintiff's face was not in that photograph. Dkt. 66 at 3; Dkt. 69. During the search, plaintiff also

7    briefly lowered his underpants to allow for a swab of his penis to collect potentially relevant

8    DNA evidence. Dkt. 66 at 3; Dkt. 69. The forensics technician, defendant Ramos, used a sterile

9    kit and explained the process to plaintiff beforehand so that he would understand what she was

10   doing. Dkt. 66 at 3; Dkt. 69. When she swabbed his penis, she did so quickly and without

11   touching plaintiff's body with any part of her own body. Dkt. 66 at 3; Dkt. 69. After performing

12   the DNA collection, plaintiff's clothing items were collected and plaintiff was given a disposable

13   jumpsuit for transport to jail. Dkt. 67 at 4; Dkt. 69. While plaintiff asserts both in his second

14   amended complaint and in his response to the instant motion that defendants "disrespectfully

15   exposed [his] nudity" in front of females by placing him in compromising positions, Dkt. 56 at

16   20–21, and did so just to "humiliate, embarrass and punish me," Dkt. 85 at 33, these allegations

17   are not supported by the record. In fact, the video itself blatantly contradicts plaintiff's account.

18   *See* Dkt. 69. As such, the facts surrounding the search are insufficient to support plaintiff's claim

19   that the scope and manner of the search are unconstitutional.

20    The third *Bell* factor is the justification for the search itself. *Bell*, 441 U.S. at 559. Here,

21   there is no question that plaintiff was a suspect in a rape case and that the Superior Court issued a

22   search warrant authorizing the seizure of certain evidence. *See* Dkt. 63 at 2–4. Defendants assert

23   that, because of the fragile nature of the evidence sought, specifically the potentially relevant

24

1   DNA evidence on plaintiff's genitals, they had to perform the search when they did because of

2   the significant risk of destruction or contamination of evidence. Dkt. 63 at 5. Further, as

3   defendant Muse declares, "the purpose [of the swab] was to collect any trace DNA evidence

4   belonging to AG. This was especially important if her DNA was found (as it ultimately was)

5   under the three layers of clothing [plaintiff] was wearing, since he maintained that he had never

6   exposed his genitals to AG or had any contact with her under his clothing." Dkt. 65 at 9. Plaintiff

7   has not challenged the finding of probable cause for the search. In light of the evidence

8   presented, the Court finds the justification for the search to be reasonable.

9          The final *Bell* factor examines the place in which the search is conducted. *Bell*, 441 U.S.

10  at 559. Here, the search was conducted in a private investigation room. Plaintiff had been

11  brought there from one of the detention cells where it is possible he could have been exposed to

12  other detainees. But, in this case, he was not, nor does he claim he was. As such, there is no

13  evidence that the search was not conducted with as much privacy as possible and, therefore, any

14  claim by plaintiff that the search was unreasonable on this basis fails. *See, e.g.*, *Michenfelder*,

15  860 F.2d at 333 (upholding strip searches of prisoners conducted at the end of hallway visible to

16  other prisoners and some officers).

17         In light of these *Bell* factors, the Court finds the search itself was reasonable because the

18  scope, manner, and place of the search were reasonable, and the evidence collection was

19  authorized by a valid search warrant. However, the analysis of plaintiff's Fourth Amendment

20  claim does not end there. Plaintiff also claims that defendants violated his Fourth Amendment

21  rights when they conducted an unnecessary cross-gender search. In order to make that

22  determination, the Court turns to whether defendants have established that exigent circumstances

23  were present at the time the search was conducted.

24

1     At the time of the search, plaintiff had already been detained on suspicion of rape and

2     police had obtained a search warrant authorizing the collection of evidence, including a swab of

3     plaintiff's genitals for potentially relevant DNA evidence. Because the investigation was actively

4     ongoing while plaintiff was detained, there was a delay in the occurrence of plaintiff's

5     interrogation and search. By the time the interrogation had concluded and a forensics technician

6     was called in for the search, it was determined that, even though that technician was female, the

7     search was necessary at that time because of the significant risk of destruction or contamination

8     of the fragile DNA evidence sought. As defendants argue, "[t]ime was of the essence." Dkt. 63 at

9     14.

10     In plaintiff's declaration submitted with his response to the motion for summary

11     judgment, plaintiff asserts that, when defendant Muse explained to him that, in connection with

12     the search of his person, someone would be taking photographs of him, seizing items of his

13     clothing, and conducting a DNA swab, "it was [defendant Muse's] plan to have females present

14     to carry out illegal unreasonable cross-gender search without an emergency." Dkt. 85 at 31–32.

15     He also argues that defendant Muse had enough time between the time plaintiff was brought to

16     the station to the time of the search itself to arrange for a male detective and male forensic

17     technician to be present for and assist in the search of plaintiff's person. *Id*. at 32–33. Instead,

18     defendant Muse deliberately planned to have females assist in the process as a tactic to humiliate

19     plaintiff and compel a confession. *Id*.

20     Given the circumstances described above, the Court finds the record on summary

21     judgment does not support plaintiff's allegations here with respect to defendant Muse's

22     intentions for a cross-gender search. In fact, these assertions do not take into account several

23     salient and undisputed facts. First, at the time plaintiff was detained, detectives were actively

24

1    investigating the allegations against him. Further, they were awaiting the results of the forensic

2    examination and interview of AG. It was not until defendant Muse received the information from

3    AG's interview and other additional details that he submitted the request for a search warrant of

4    plaintiff's person. After submitting that request, it was reasonable for detectives to interrogate

5    plaintiff prior to conducting the search. Detectives could not have known how long that

6    interrogation would last, nor whether plaintiff would admit or deny the allegations. Therefore, at

7    the time detectives were ready to call for the search, which again needed to happen that night and

8    before plaintiff could use the bathroom and potentially wash away the evidence, defendant Muse

9    had no choice but to allow for a female forensics technician to complete the search.

10        Plaintiff also contends that, at the time the search warrant was issued at 1:18 a.m., a male

11    forensics technician was still on duty and could have performed the search, but defendant Muse

12    deliberately waited to call for the search until after that male technician was off-duty. Dkt. 85 at

13    35–37. However, the evidence of record does not support plaintiff's allegation. First, the record

14    shows that, even though there was a male technician on duty at the time the warrant was issued

15    and the interrogation had begun, by the time defendant Muse had concluded his interrogation,

16    there was no longer a male technician on duty at that hour. Dkt. 63 at 5. Plaintiff has presented

17    no evidence showing that defendant Muse knew that male technician was off-duty at the time he

18    called for the search or even that he knew there was only a female technician on duty. Rather, it

19    is undisputed that waiting any longer would likely have resulted in the loss of some or all of the

20    potentially relevant DNA evidence. As such, it was not unreasonable under the circumstances for

21    a female forensics technician to conduct the evidence collection.

22        In addition to his claim of an unconstitutional cross-gender search relating to the

23    evidence collection, plaintiff also claims that the presence of defendant Dier, the female

24

1   detective at plaintiff's interview, violated his Fourth Amendment rights. Plaintiff alleges that

2   defendant Dier "sat closely comfortably viewing the action and watching the plaintiff." Dkt. 56

3   at 20. Defendants counter that, while defendant Dier was present in the room for the search and

4   standing by the door, she was primarily looking away while the evidence was collected and was

5   not looking at plaintiff. Dkt. 63 at 14–15; Dkt. 89 at 6. Further, it is undisputed that she had no

6   physical contact with plaintiff during the search. *See* Dkt. 69.

7           The Court concludes that the record here does not support a finding that defendant Dier

8   violated plaintiff's Fourth Amendment rights by remaining present during the search at the door

9   of the interview room. This finding is consistent with Ninth Circuit caselaw demonstrating that

10  infrequent, limited cross-gender exposure can withstand a constitutional challenge. *See, e.g.*,

11  *Michenfelder*, 860 F.2d at 334 (holding infrequent or isolated presence of female guards in the

12  control booth during male prisoner body cavity searches and occasional shower duty is

13  reasonable); *Grummett v. Rushen*, 779 F.2d 491, 495 (9th Cir. 1985) (upholding cross-gender

14  surveillance of male shower area where female guards' observation is infrequent, casual, or at a

15  distance). Thus, without more, defendant Dier's mere presence does not rise to the level of a

16  Fourth Amendment violation.

17          In sum, plaintiff has failed to overcome defendants' evidence that the search of his person

18  was reasonable and that, in light of the exigent circumstances surrounding the collection of

19  sensitive DNA evidence and the mere presence in the room of a female detective without any

20  evidence that she was actually looking at plaintiff, the cross-gender search was reasonable.

21  Accordingly, no reasonable jury could conclude that defendants conducted a search in violation

22  of the Fourth Amendment. The Court recommends that the motion for summary judgment be

23  granted in favor of defendants on this claim.

24

1    **IV.    Fifth Amendment Claim**

2        Plaintiff asserts that defendants demeaned him by forcing him into compromising

3    positions while searching his person, doing so for their own "enjoyment and fun," and in order to

4    compel an illegal confession from him. Dkt. 56 at 21. Defendants argue that plaintiff's claim is

5    refuted by the evidence on record. Dkt. 63 at 16–17. Upon review, the Court agrees with

6    defendants.

7        "No person . . . shall be compelled in any criminal case to be a witness against himself . .

8    . ." U.S. Const. amend. V. "[T]he Fifth Amendment provides a right against compelled self-

9    incrimination, but that right only applies when a compelled statement is used against a defendant

10   in a criminal case." *Chavez v. Robinson*, 12 F.4th 978, 989 (9th Cir. 2021) (citation and internal

11   quotation marks omitted). So only after a compelled incriminating statement is used in a criminal

12   proceeding has an accused suffered the requisite constitutional injury for purposes of a § 1983

13   action." *Id.* (alteration adopted) (citation and internal quotation marks omitted). In addition to at

14   trial, a "coerced statement has been 'used' in a criminal case when it has been relied upon to file

15   formal charges against the declarant, to determine judicially that the prosecution may proceed,

16   and to determine pretrial custody status." *Stoot v. City of Everett*, 582 F.3d 910, 925 (9th Cir.

17   2009).

18       "A person subjected to coercive interrogation techniques can bring a substantive due

19   process claim under the Fourteenth Amendment." *Tobias v. Arteaga*, 996 F.3d 571, 584 (9th Cir.

20   2021) (citations omitted). "The substantive due process standard requires showing that an officer

21   engaged in an abuse of power that shocks the conscience and violates the decencies of civilized

22   conduct." *Id.* (alteration adopted) (citation and internal quotation marks omitted). "The Supreme

23   Court has described police torture or other abuse as the type of claim cognizable under the

24

1    Fourteenth Amendment." *Id.* (citation omitted). "However, police conduct need not include

2    physical violence to violate substantive due process." *Id.* (citation and internal quotation marks

3    omitted). "*[P]sychological* coercion [may be] sufficient to state a ['shocks the conscience']

4    claim under the Fourteenth Amendment." *See Stoot*, 582 F.3d at 929 (citation omitted).

5          Here, Defendants rely on the video of plaintiff's interview to refute plaintiff's allegations

6    regarding his interrogation and supposed illegal confession. Dkt. 63 at 16–17. As they correctly

7    point out, even viewing the video in a light most favorable to plaintiff, throughout the entire

8    interview plaintiff continued to deny that he had any sexual contact with AG. *See* Dkt. 69.

9    Hence, there is no confession to speak of. Additionally, the Court sees no evidence on the video

10   of plaintiff being forced into compromising positions at any point during the interview. *See* Dkt.

11   69. "When opposing parties tell two different stories, one of which is blatantly contradicted by

12   the record, so that no reasonable jury could believe it, a court should not adopt that version of the

13   facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372,

14   380 (2007) (finding one party's version of events "so utterly discredited by the record that no

15   reasonable jury could have believed him"). Therefore, because plaintiff has failed to establish a

16   violation of his Fifth Amendment rights here, the Court recommends that defendants' motion for

17   summary judgment be granted as to this claim.

18          **V.    Fourteenth Amendment Claims**

19          Defendants argue in their motion for summary judgment that, while plaintiff has not

20   clarified in his second amended complaint whether he is asserting, under the Fourteenth

21   Amendment, a violation of his equal protection rights or his substantive due process rights, the

22   record does not support either claim and therefore both claims should be dismissed. *See* Dkt. 63

23   at 17–19. The Court agrees that it is not entirely clear that plaintiff has asserted both these

24

violations in the remaining Count IV of his complaint (*see* Dkt. 56 at 20–24), but in the interests of justice to this *pro se* plaintiff and finality of decision, the Court nevertheless will discuss the allegations in turn.

### 1.    Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation and internal quotation marks omitted). "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (citation omitted).

Furthermore, "[w]here . . . state action does not implicate a fundamental right or a suspect classification, the plaintiff can establish a 'class of one' equal protection claim by demonstrating that it 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

Here, to the extent that Count IV of the second amended complaint contains an allegation that defendants were biased against him and discriminated against him based on his race and national origin, *see* Dkt. 56 at 20–24, the record fails to show that defendants engaged in the conduct at issue based on his race or national origin. Furthermore, the record fails to show that defendants intentionally treated him differently from similarly situated individuals and that there was no rational basis for the different treatment. Simply put, the fact that defendant Muse noticed

1  plaintiff's accent and subsequently engaged plaintiff in conversation in order to determine that

2  plaintiff would comprehend the interview and be able to communicate with the detectives, does

3  not amount to a violation of equal protection. *See* Dkt. 65 at 6–7. Moreover, there is no evidence

4  that defendant Muse's observation and inquiry, or any of the other behaviors by detectives

5  during the investigation for that matter, was motivated by discriminatory animus. Rather,

6  plaintiff's allegations of bias and discrimination are conclusory, and should be dismissed. The

7  Court recommends that defendants' motion for summary judgment on this claim be granted in

8  their favor.

9           2.      *Substantive Due Process*

10         Pretrial detainees have a substantive due process right against restrictions that amount to

11  punishment. *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002) (citing *United States v.*

12  *Salerno*, 481 U.S. 739, 746 (1987); *Bell*, 441 U.S. at 535). Moreover, pretrial detainees have a

13  right to bodily privacy. *Byrd v. Maricopa Cnty. Bd. of Supervisors*, 845 F.3d 919, 923 (9th Cir.

14  2017) (citing *Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988)); *see also Vazquez v.*

15  *County of Kern*, 949 F.3d 1153, 1160 (9th Cir. 2020). Generally, the right does not apply where

16  observation of a pretrial detainee's naked body is "only infrequent and casual" or "at [a]

17  distance," and it is "reasonably related to prison needs." *Michenfelder*, 860 F.2d at 334; *see also*

18  *Byrd*, 845 F.3d at 922, 924 (allegations that the defendants' policy of having female prison

19  guards "regularly" view a male pretrial detainee's bathroom and shower use from four to five

20  feet away violated his Fourteenth Amendment right to bodily privacy and could not be dismissed

21  without an answer); *Vazquez*, 949 F.3d at 1160–62 (reversing summary judgment in favor of the

22  defendant on the plaintiff's Fourteenth Amendment right to bodily privacy claim where the male

23  defendant watched the female plaintiff in the shower multiple times and a reasonable jury could

24

1    conclude the alleged viewings were not "infrequent and casual"). Stated otherwise, "since the

2    right of privacy is a fundamental right it may be restricted only if the limitation is justified by a

3    compelling state interest." *Grummett v. Rushen*, 779 F.2d 491, 494 (9th Cir. 1985) (quotations

4    omitted). Further, analysis of a Fourteenth Amendment bodily privacy claim largely mirrors that

5    of a Fourth Amendment body-search claim. *Byrd*, 845 F.3d at 923.

6         Here again, it is undisputed that defendants conducted the search of plaintiff's person

7    pursuant to a valid search warrant. As such, defendants possessed a legitimate governmental

8    interest in the collection of potentially relevant DNA evidence. As set forth above, defendants

9    have demonstrated not only that the search was reasonable, but also the cross-gender search was

10   reasonable. Under these circumstances of a reasonable search, plaintiff has not shown that the

11   restricted involvement of the female forensic technician and detective is so demeaning as to

12   require the intervention of this Court. *See Grummett*, 779 F.2d at 494–95 (restricted observations

13   of male prisoners in shower area does not rise to level of Fourteenth Amendment violation).

14   Therefore, the Court recommends that defendants' motion for summary judgment be granted in

15   their favor as to this claim.

16        **VI.    Qualified Immunity**

17        Defendants assert that, even if plaintiff has presented evidence sufficient to survive a

18   motion for summary judgment on his § 1983 claims, qualified immunity nonetheless protects

19   them from liability for damages.

20        Qualified immunity requires an assessment of whether the official's conduct violated

21   "'clearly established constitutional or statutory rights of which a reasonable person would have

22   known.'" *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*,

23   137 S. Ct. 548, 551 (2017)). The Court evaluates a defendant's qualified immunity defense using

24

a two-step inquiry. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The Court can analyze the two

prongs of qualified immunity in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Under *Saucier*'s first prong, the Court must determine whether, viewing the facts in the

light most favorable to the plaintiff, the government employees violated plaintiff's constitutional

rights. *Saucier*, 533 U.S. at 201. If the Court determines that a constitutional violation has

occurred, under *Saucier*'s second prong, it must determine whether the rights were clearly

established at the time of the violation. *Id*. For a right to be clearly established, its contours "must

be sufficiently clear that a reasonable official would understand that what he is doing violates the

right." *Id*. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The protection

afforded by qualified immunity "safeguards 'all but the plainly incompetent or those who

knowingly violate the law.'" *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149

F.3d 971, 977 (9th Cir. 1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Here, the Court has concluded that defendants did not violate plaintiff's constitutional

rights. Therefore, it is not necessary to address defendants' qualified immunity argument.

### VII.    *Monell* Claim

Plaintiff also alleges that defendant City of Tacoma had a policy and/or custom that

"emboldened" or caused defendants Muse, Dier, and Ramos to violate the Fourth Amendment in

conducting their cross-gender search. Dkt. 56 at 24. Defendants contend that plaintiff has failed

to establish that the City's training policies with respect to searches were adopted with deliberate

indifference to plaintiff's constitutional right to be free from an unreasonable search. Dkt. 63 at

22–24.

Municipalities may be held liable as "persons" under § 1983, but not for the

unconstitutional acts of their employees based solely on a *respondeat superior* theory. *Monell v.*

1    *New York City Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978). Rather, a plaintiff seeking to

2    impose liability on a municipality under § 1983 is required "to identify a municipal 'policy' or

3    'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403,

4    (1997) (citing *Monell*, 436 U.S. at 694; *Pembaur v. Cincinnati*, 475 U.S. 469, 480–81 (1986);

5    and *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). A *Monell* claim may be stated under

6    three theories of municipal liability: (1) when official policies or established customs inflict a

7    constitutional injury; (2) when omissions or failures to act amount to a local government policy

8    of deliberate indifference to constitutional rights; or (3) when a local government official with

9    final policy-making authority ratifies a subordinate's unconstitutional conduct. *Clouthier v. Cnty.*

10   *of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010).

11       Here, since, as discussed above, plaintiff has failed to present evidence from which a

12   reasonable jury could find a cognizable constitutional violation by a specific government actor,

13   plaintiff's *Monell* claim necessarily fails. *See, e.g.*, *Tatum v. City and County of San Francisco*,

14   441 F.3d 1090, 1100 (9th Cir. 2006) (district court properly granted summary judgment in favor

15   of defendant government entities on *Monell* claim where alleged conduct underlying plaintiff's

16   section 1983 claim did not amount to a constitutional deprivation by any individual government

17   official) (citations omitted); *see also Jackson v. Bremerton*, 268 F.3d 646, 653–54 ("Neither a

18   municipality nor a supervisor . . . can be held liable under § 1983 where no injury or

19   constitutional violation has occurred.). Stated otherwise, because no constitutional violation or

20   injury occurred with respect to the cross-gender search of plaintiff, plaintiff cannot establish a

21   *Monell* claim for municipal liability for the search.

22       Accordingly, the Court recommends that summary judgment be granted in favor of

23   defendants on this claim.

24

### VIII.   IFP on Appeal

IFP status on appeal shall not be granted if the district court certifies "before or after the notice of appeal is filed" "that the appeal is not taken in good faith[.]" Fed. R. App. P. 24(a)(3)(A); *see also* 28 U.S.C. § 1915(a)(3). A plaintiff satisfies the "good faith" requirement if he seeks review of an issue that is "not frivolous," and an appeal is frivolous where it lacks any arguable basis in law or fact. *Gardner v. Pogue*, 558 F.2d 548, 551 (9th Cir. 1977); *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Because the decision in this case is largely based on undisputed facts, an appeal from this matter would be frivolous, the Court recommends that plaintiff's IFP status not be granted for purposes of any appeal.

### CONCLUSION

The undersigned recommends that the motion for summary judgment filed by defendants Muse, Dier, Ramos, and City of Tacoma (Dkt. 63) be granted and that plaintiff's claims be dismissed with prejudice. Plaintiff's IFP status should not be granted for purposes of appeal.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **January 27, 2023**, as noted in the caption.

1    Dated this 9th day of January, 2023.

2

3

4    _____
     J. Richard Creatura
5    Chief United States Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24