The Honorable Barbara J. Rothstein

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MICHAEL M. MUNYWE,

    Plaintiff,

v.

SCOTT R. PETERS, *et al.*,

    Defendants.

Civil Action No. 2:21-cv-05431-BJR

**ORDER ADOPTING REPORT AND RECOMMENDATION AND DISMISSING CASE WITH PREJUDICE**

## I.    INTRODUCTION

Plaintiff Michael Munywe brought this § 1983 action against various Pierce County law enforcement officials and agencies alleging that Defendants violated his constitutional rights during his pretrial detention. Defendants filed a motion for summary judgment arguing that Plaintiff has not alleged a viable claim and cannot show a constitutional violation. Dkt. No. 63. This Court referred the motion to Magistrate Judge J. Richard Creatura who issued a Report and Recommendation recommending that the motion be granted and the case dismissed with prejudice. Dkt. No. 113. Having reviewed the Report and Recommendation, Plaintiff's objections thereto (Dkt. No. 114), the record of the case, and the relevant legal authority, the Court adopts the Report and Recommendation, grants Defendants' motion for summary judgment, and dismisses this case with prejudice. The reasoning for the Court's decision follows.

## II.     BACKGROUND

### A.     Procedural History

Plaintiff,[1] proceeding in this action *pro se* and *in forma pauperis*, filed this action in June 2021, raising claims related to his detention on the evening of November 21, 2018 on suspicion of sexual assault of a minor and subsequent conviction for second-degree rape and unlawful imprisonment. *See* Dkt. No. 7. In his initial complaint, Plaintiff sued: (1) Scott R. Peters, a prosecutor; (2) Julie Dier, a detective; (3) Malerie Ramos, a crime scene technician; (4) William Muse, a detective; (5) the City of Tacoma; (6) Jennifer Hayden, a DNA analyst; and (7) Washington State Patrol Crime Laboratory. *See* Dkt. No. 52 at 3. Plaintiff alleged that: (1) certain Defendants conspired to falsify evidence and suppress exculpatory DNA evidence; and (2) other Defendants conducted a cross-gender search of him while he was naked. *Id*. at 1–2.

Extensive motion practice ensued and now only four claims remain: (1) a Fourth Amendment claim based on the cross-gender search, (2) a Fifth Amendment claim alleging that there was a coerced confession, (3) a Fourteenth Amendment claim for disparate and/or punitive treatment, and (4) a *Monell* claim against the City of Tacoma. Likewise, only four Defendants remain: Detectives Dier and Muse, Crime Scene Technician Ramos, and the City of Tacoma. As stated above, these Defendants now move for summary judgment on the remaining claims. Dkt. No. 63.

### B.     Factual Background

The Report and Recommendation sets forth the factual background as follows[2]:

---

[1] Plaintiff is currently incarcerated at the Washington State Penitentiary.
[2] Plaintiff does not object to the factual background as set forth in the Report and Recommendation. He does attempt to insert other facts that are not relevant to this case, but rather, form the basis for another § 1983 action he filed that has since been dismissed. *See Munywe v. Dier*, WAWD 3:21-cv-5218-BJR, Dkt. No. 54. As such, the Court will disregard those allegations.

This case arises out of the Tacoma Police Department's investigation of a rape case. On November 21, 2018, Tacoma Police Officers Jeff Thiry and Brian She were dispatched to Tacoma Avenue South for an unknown trouble call. … According to the 911 dispatcher, the caller—later identified as 15-year-old female, AG—was pretending to be talking to her mother so that plaintiff would not know she was calling 911, and described her clothing and location. When the dispatcher asked if someone was trying to hurt her, AG responded in the affirmative. The officers dispatched to the area, conducted a search and observed AG and a male, later identified as plaintiff, walking on South 9th Street. The officers contacted the parties and AG reported that plaintiff, who was unknown to her, had pulled her into an alley, raped her, and began following her thereafter. AG was visibly distraught, but plaintiff denied that anything had occurred. When the officers noted plaintiff's accent, he informed them he was from Kenya. The officers further observed that the fly to plaintiff's pants was disheveled. Officer Thiry transported plaintiff to Tacoma Police Department headquarters and placed him in a holding cell to await further investigation and questioning by detectives. Officer She transported AG to Mary Bridge Children's Hospital for a sexual assault examination and subsequently to the Child Advocacy Center for a forensic interview.

While plaintiff was in the detention cell, detectives were actively investigating the allegations against plaintiff. While they awaited the results of the forensic examination and interview of AG, defendant Muse, the lead investigator, prepared an affidavit for a search warrant for plaintiff's person and clothing. Based on the information obtained during the investigation, detectives anticipated finding trace DNA evidence from AG on plaintiff's clothing and penis. As a result, the search warrant contained requests for a search of plaintiff's person, including his pubic region and a swabbing of his genitals, as well as collection of plaintiff's pants and underpants.

After defendant Muse received the information from AG's forensic interview, including additional details regarding plaintiff's sexual assault of AG, he contacted the on-call judge from the Pierce County Superior Court and was sworn in. Judge Shelly Speir then issued the search warrant at 1:18 a.m. on November 22, 2018.

Back at the Tacoma Police Department headquarters, plaintiff was escorted from the detention area to an interview room. According to defendant Muse, when plaintiff entered the interview room for interrogation, defendant Muse advised him that the room was equipped with audio and video recording equipment that was already activated for the interview. Plaintiff looked at the wall where the camera was located, understood the interview was being recorded, and did not object or protest. Present for the interview were plaintiff and defendants Muse and Dier.

Defendant Muse then removed plaintiff's handcuffs, inspected plaintiff's wrists and noticed no injuries, and provided plaintiff with a cup of water. Defendant Muse then advised plaintiff of his Miranda rights. He placed the advisement of rights form on the table in front of plaintiff and positioned it so that plaintiff could read it silently

while defendant Muse read it aloud. At the end of each warning on the form, defendant Muse confirmed that plaintiff understood. After he read aloud the entire form, defendant Muse asked plaintiff if he understood all of his rights. Plaintiff indicated that he did, agreed to waive his rights and to speak with detectives without an attorney present, and signed the form.

Defendant Muse immediately noticed plaintiff's accent and initiated a conversation with plaintiff about his background. Plaintiff told him he was born and raised in Kenya and had moved to the United States in 2014. Defendant Muse wanted to make sure plaintiff would be able to converse comfortably in English, so asked him about his proficiency in the language. Plaintiff indicated that he learned English while in elementary school in Kenya. After they discussed further various topics, defendant Muse was satisfied that plaintiff could comprehend English and would be able to communicate with detectives.

Turning to the events of November 21, 2018, plaintiff admitted to having consumed a pint of vodka in the afternoon and told detectives that he met AG while walking through the campus of Bates Technical College. He admitted to hugging AG over her clothes, but denied any other physical contact with her, including any sexual contact. After further questioning about the details of his contact with AG, plaintiff never admitted to any physical contact other than the hugging. Defendants Muse and Dier did not raise their voices or use profanities or threats during the interview. They then terminated that line of questioning and left the interview room.

At that point, defendants Muse and Dier called for Forensics to come to the interview room for collection of evidence authorized by the warrant. Subsequently, defendants Muse and Dier came back to the interview room and defendant Muse read the search warrant to plaintiff. Specifically, defendant Muse advised plaintiff that the warrant authorized the retrieval of DNA from plaintiff's person, the taking of photographs of plaintiff, and the collection of plaintiff's pants and underpants.

The forensics technician, defendant Ramos, arrived at the interview room at approximately 2:42 a.m. She was the sole forensics technician on duty at that time of day. There were no male technicians on duty at that hour. A male crime scene technician had left his shift that night on time at 2:00 a.m., and no other male technician was scheduled to be on shift until 8:00 a.m. the following day.

According to defendant Ramos, the detectives explained to plaintiff who she was and what the purpose was for her coming into the room. She wore gloves throughout the entire process and explained to plaintiff step-by-step each photograph she was taking. Defendant Ramos took photographs of certain clothing items, but plaintiff always had some articles of clothing on his body throughout the process. She asked him to briefly lower his underpants and took a single photograph of plaintiff's genitals, and then he pulled the underpants back up. She ensured plaintiff's face was not in that photograph.

Defendant Ramos then prepared the swabs for the DNA collection. She used a sterile kit, and explained to plaintiff the process beforehand so that he would understand what she would be doing. Defendant Ramos asserts that plaintiff did not appear to be confused or evince any noticeable distress or concern. She asked him to lower his underpants again so that she could swab his penis. When she swabbed his penis, she did so as quickly as possible and without touching plaintiff's body with any part of her body. After the DNA collection and pursuant to the warrant, plaintiff's clothing items, namely his underpants and pants, were collected and plaintiff was given a disposable jumpsuit for transport to jail.

Defendant Dier, the female detective present for the interview, remained in the room for the search and was present by the door, but primarily looked away while the evidence was collected. Defendant Muse, the male detective present, assisted defendant Ramos with the evidence collection process, but never touched plaintiff. All three defendants—Muse, Dier, and Ramos—assert that, because of the fragile nature of the evidence sought, specifically the biological swab, investigators could not wait until the following day because of the significant risk of destruction or contamination of evidence. Further, defendant Muse declares that "the purpose [of the swab] was to collect any trace DNA evidence belonging to AG. This was especially important if her DNA was found (as it ultimately was) under the three layers of clothing [plaintiff] was wearing, since he maintained that he had never exposed his genitals to AG or had any contact with her under her clothing."

The Pierce County Prosecuting Attorney charged plaintiff with rape in the first degree and kidnapping. Following a jury trial, plaintiff was convicted of rape in the second degree and unlawful imprisonment and sentenced to a term of imprisonment. His conviction and sentence have been affirmed by Division II of the Washington State Court of Appeals.

Dkt. No. 113 at 6-11 (internal citations omitted).

C.     **Plaintiff's Claims**

Plaintiff alleges that Defendants Muse, Dier, and Ramos violated his constitutional rights during an interview in the Tacoma Police Department. Dkt. 56 at 20. Specifically, he claims that Defendants "disrespectfully exposed [his] nudity" in order to "psychologically and emotionally torture, humiliate and embarrass" him while taking photographs of him and collecting evidence from him following his arrest. *Id*. He alleges that Defendants "took a series of many many unnecessary photographs" that had "no legal purpose whatsoever" because "there was another video camera that was recording the whole episode." *Id*. Plaintiff further claims that these

5

Defendants so acted "for their personal enjoyment and fun." *Id*. He also claims that the presence of Defendants Ramos and Dier—both female—was unnecessary since male officers and technicians were available and within the vicinity. *Id*. at 20–21. Plaintiff adds that Defendants interrogated him while nude and embarrassed in front of females "to compel a confession." *Id*. at 21.

Plaintiff also alleges that Defendant City of Tacoma's "policy, lack of policy, custom, norms or failure to train properly" caused Defendants Muse, Dier, and Ramos to violate his constitutional rights during the search. *Id*. at 24. Plaintiff seeks damages, declaratory, and injunctive relief. Dkt. 56 at 26; 28–29.

### III.   DISCUSSION

#### A.   Standard of Review

Summary judgment should be granted when "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating an absence of any genuine issue of material fact. *Playboy Enter., Inc. v. Netscape Commc'n Corp.*, 354 F.3d 1020, 1023-24 (9th Cir. 2004). Where the moving party does not bear the burden of proof, however, it may meet its burden by showing an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once it has done so, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Non-moving

parties must "produce at least some significant probative evidence tending to support" their allegations. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990) (quoting *T.W. Elec. Serv., Inc. v. Pacific Elect, Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)). Where they fail to do so, summary judgment is appropriate.

This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Where a party timely objects to a magistrate judge's report and recommendation, then the court is required to "make a de novo determination of those portions of the [report and recommendation] to which objection is made." 28 U.S.C. § 636(b)(1).

**B.     Analysis**

The Report and Recommendation concludes that Plaintiff failed to rebut Defendants' showing that they are entitled to summary judgment as to his Fourth, Fifth, Fourteenth Amendment and *Monell* claims. Specifically, the Magistrate Judge determined that: (1) Plaintiff failed to establish that the search of his person violated the Fourth Amendment because the search itself was reasonable and exigent circumstances necessitated the need for a cross-gender search, (2) Plaintiff failed to establish that Defendants violated his Fifth Amendment right against compelled self-incrimination because Plaintiff was not subjected to coercive interrogation techniques, nor did he provide a confession, let alone a compelled one, and (3) Plaintiff failed to establish that Defendants violated his Fourteenth Amendment rights because there is no evidence Plaintiff was subjected to disparate treatment based on his race or national origin or that the search of his person was conducted for punitive reasons. Given the foregoing, the Magistrate Judge also concluded that Plaintiff's *Monell* claim against the City is not viable. Accordingly, the

Magistrate Judge recommends that Defendants' motion for summary judgment be granted and Plaintiff's claims be dismissed with prejudice.

Plaintiff timely filed objections to the Magistrate Judge's findings and recommendations. Dkt. No. 114. For the reasoning set forth below, the Court overrules each of Plaintiff's objections.[3]

### 1. Plaintiff's Fourth Amendment Claim

Plaintiff alleges that Defendants violated the Fourth Amendment when they subjected him to a cross-gender search while he was naked. Dkt. No. 56 at 20-24. The Fourth Amendment prohibits unreasonable searches. *Bell v. Wolfish*, 441 U.S. 520, 558 (1979). The reasonableness of the search is determined by the context, which requires a balancing of the need for the particular search against the invasion of personal rights the search entails. *Id*. at 558–59 (quotations omitted). Factors that must be evaluated are (1) the scope of the particular intrusion, (2) the

---

[3]Plaintiff raises three preliminary objections that have no bearing on the instant decision. First, he points out that the Magistrate Judge mistakenly refers to the Defendants as being from King County instead of Pierce County. Plaintiff is correct that this error occurred, but it is harmless and does not affect the outcome of the motion. Second, Plaintiff objects that Defendants are "refusing" to pay a $4500.00 sanction that the Magistrate Judge allegedly ordered on October 25, 2022. Plaintiff is referring to a motion he filed on July 13, 2022 that he titled "Plaintiff's Motion and Declaration for Sanctions and Denial of Summary Judgment to City Defendant for Misleading Court by Sending Blank CDs to Plaintiff Two Times". Dkt. No. 86. The Magistrate Judge construed the motion as a motion to defer consideration of Defendants' previously filed summary judgment motion pursuant to Federal Rule of Civil Procedure 56(d). Dkt. No. 102. In the motion, Plaintiff alleged that the Defendants had twice sent him a CD that allegedly showed his interrogation while in police custody but, in fact, the CD was blank. Among other relief requested, Plaintiff sought $4500.00 in sanctions against Defendants. Plaintiff is correct that the Magistrate Judge granted Plaintiff's motion and directed Defendants to provide Plaintiff "with a complete, readable CD/DVD copy of the entire video-recorded interview of plaintiff on November 22, 2018, on or before **November 8, 2022**." Dkt. No. 102 at 4 (bold in original). The Magistrate Judge also set a revised briefing schedule for the summary judgment motion. However, the Magistrate Judge did ***not*** order Defendants to pay Plaintiff $4500.00 as he now alleges. Thus, Defendants do not owe Plaintiff any money. Lastly, Plaintiff objects that Defendants violated his First Amendment rights. This claim was dismissed long ago and will not be addressed again here.

manner in which it is conducted, (3) the justification for initiating it, and (4) the place in which it is conducted. *Id*. at 559 (quotations omitted). In addition, the Ninth Circuit has long recognized that "the desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963). Thus, the Ninth Circuit has determined that "cross-gender strip searches in the absence of an emergency or exigent circumstances" may violate an inmate's right under the Fourth Amendment to be free from unreasonable searches. *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1143, 1147 (9th Cir. 2011).

Applying the foregoing legal authority to the case at hand, the Magistrate Judge determined the cross-gender search of Plaintiff while he was naked was reasonable because of the scope, manner, and place of the search were reasonable, and the evidence collection was authorized by a valid search warrant. The Magistrate Judge further determined that exigent circumstances existed that rendered it reasonable for a female technician to conduct the evidence collection. These exigent circumstances included the risk of losing some or all of the relevant DNA evidence and the fact that the search occurred in the early morning hours when only a female technician was available because Defendants needed to await the results of the forensic examination and interview of A.G. and obtain a search warrant.

Plaintiff counters that it is "irrelevant" that the search and evidence collection was done pursuant to a valid search warrant. Relying on the Ninth Circuit's decision in *Byrd*, he argues that while Defendants had a valid search warrant, they did not have a right to "demean" and "humiliate" him by allowing a female technician to collect the DNA sample and by allowing a female detective to observe the search.

Plaintiff is mistaken. While the caselaw is clear that cross-gender strip searches in the absence of an emergency may violate an inmate's right under the Fourth Amendment, the caselaw is equally clear that exigent circumstances can render a cross-gender search reasonable. *Byrd*, 629 F.3d at 1146; *see also Cookish v. Powell*, 945 F.2d 441, 448 (1st Cir. 1991) ("The caselaw supports the conclusion that, in an emergency situation, a visual body cavity search conducted within the view of a guard of the opposite sex, even if other than an inadvertent and/or restricted view, would not violate an inmate's Fourth Amendment right."); *Moore v. Carwell*, 168 F.3d 234, 236 (5th Cir. 1999) ("[T]he mere *presence* of female officers during a strip search of prisoners during *emergency circumstances* did not violate the Fourth Amendment.") (citation omitted) (emphasis in original). Here, such exigent circumstances existed. Plaintiff stood accused of rape making the collection of bodily trace fluids (such as blood, semen, DNA, and saliva) important, but of course, the collection could not be done without a valid search warrant. Nearly eight hours passed between Plaintiff's arrest and the issuance of the warrant (during which time the victim was transported to the hospital where she was examined, treated, and then a forensic interview conducted, a complaint for a search warrant was produced, and the on-call Pierce County Superior Court Judge was contacted who reviewed the complaint and issued the warrant). Dkt. No. 65 at ¶¶ 11-16. Given the potential for bodily trace fluids to degrade, become contaminated, and/or wash away through using the restroom or other means, it was imperative that the evidence be collected as soon as the warrant was issued, here at approximately 2:00 in the morning. *Id*. at ¶¶ 16, 27; Dkt. No. 66 at ¶ 7. At that point, Defendant Ramos was the only crime scene technician on duty. Dkt. No. 65 at ¶ 25. The Court agrees with the Magistrate Judge, the exigent circumstances surrounding Plaintiff's search rendered the cross-gender search reasonable.

What is more, the Court has reviewed the video recording of the search and finds that it was done respectfully and professionally. At no point was Plaintiff ever fully naked; rather, he remained clothed from his waist up. And he remained clothed from the waist down for the vast majority of the search, only briefly pulling his underwear down twice: once so that Defendant Ramos could take a picture of Plaintiff's genitals (ensuring that his face was not in the picture), and once so that Defendant Ramos could quickly swab his genitals. Defendant Ramos explained each of her actions before taking them, wore gloves the entire time, and did not allow her body to come into contact with Plaintiff. Plaintiff's pants and underwear were collected as evidence at the conclusion of the search, and he was given a Tyvek-style suit to wear. This entire process only took a few minutes, no one touched Plaintiff, and everyone was respectful throughout.

Plaintiff also complains that Defendant Dier (also female) was in the interrogation room during the search. Defendant Dier was in the room because she was a member of the investigation team assigned to Plaintiff's case and participated in his interview. Dkt. No. 67 at ¶ 9. Once again, this Court reviewed the video recording of the search and notes that contrary to Plaintiff's allegations, Defendant Dier did not "closely watch" the search. Although Defendant Dier sat within a few feet of Plaintiff while he was being interviewed, she moved away from Plaintiff to the back of the room and stood near the doorway during the few minutes that he was searched. Indeed, she even left the room at one point. She did not talk to Plaintiff, touch him or his clothing, or otherwise participate in the search. The Ninth Circuit has determined that similar circumstances did not constitute a Fourth Amendment violation. *See*, *e.g.*, *Sattler v. Foster*, 37 Fed. App'x 311, 312 (9th Cir. 2002) ("Occasional viewing of male prisoners by female correctional officers does not violate the Fourth Amendment right to privacy[.]"); *Kuntz v. Wilson*, 1994 WL 417424, at *1 (9th Cir. Aug. 19, 1994) ("Prisoners have only a very limited

right of bodily privacy from guards of the opposite sex.... The assignment of female prison guards to positions requiring only infrequent and casual observation of naked male prisoners does not violate the prisoners' right to privacy.") (citation omitted); *Grummett v. Rushen*, 779 F.2d 491, 495 (9th Cir. 1985) (holding that "infrequent and casual observation, or observation at a distance" did not violate inmates' constitutional rights); *Michenfelder v. Sumner*, 860 F.2d 328, 334 (9th Cir. 1988) (holding that female guard's presence during male inmate search was an isolated incident that did not violate inmate's constitutional rights). Likewise, courts in other circuits have recognized that an inmate's "right to privacy" is not violated by "occasional, indirect, or brief viewing of a naked prisoner by a guard of the opposite sex." *Correction Officers Benev. Ass'n of Rockland County v. Kralik*, 2011 WL 1236135, *11 (S.D.N.Y. March 30, 2011); *see also Thomas v. Shields*, 1992 WL 369506, at *1 (4th Cir. Sept. 15, 1992) (male plaintiff's "right to privacy was not violated by the occasional, inadvertent encounter with female guards" who observed him in the shower and on the toilet). Thus, for the foregoing reasons, the Court overrules Plaintiff's objections and adopts the Report and Recommendation as to the Fourth Amendment claim.

2.  **Plaintiff's Fifth Amendment Claim**

Plaintiff asserts that Defendants subjected him to the cross-gender search to compel a confession from him. "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. "[T]he Fifth Amendment provides a right against compelled self-incrimination, but that right only applies when a compelled statement is used against a defendant in a criminal case." *Chavez v. Robinson*, 12 F.4th 978, 989 (9th Cir. 2021) (citation and internal quotation marks omitted). The Magistrate Judge rejected Plaintiff's Fifth Amendment claim for two reasons. First, the Magistrate Judge noted that contrary to Plaintiff's argument, he never made a confession, instead insisting throughout the interview that he did not

have sexual contact with A.G., thus "there is no confession to speak of." Dkt. No. 113 at 22. Second, the Magistrate Judge reviewed the video of Plaintiff's interview and concluded that there is no evidence of him "being forced into compromising positions at any point during the interview." *Id*.

Plaintiff objects to the Magistrate Judge's conclusion, arguing that while he did not admit to having sexual contact with A.G. during the interview, he did provide other information that was used against him during his trial. Plaintiff does not expand on this claim; rather, he simply states that "[t]here are other many [*sic*] informations [*sic*] that Plaintiff shared to the Defendants and those informations [*sic*] were all sugarcoated and were used by the disgraced Defendant Scott Robert Peters in his bid to secure" Plaintiff's conviction. Dkt. No. 114 at 14. Such unsubstantiated statements are insufficient to defeat summary judgment. *See F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). Moreover, this Court has reviewed the interview recording and agrees with the Magistrate Judge that the interview was not conducted in an unconstitutional manner. Indeed, the interview had concluded before Defendants searched Plaintiff (or even made him aware that they had a search warrant). Therefore, the Court overrules Plaintiff's objections and adopts the Report and Recommendation as to the Fifth Amendment claim.

### 3. Plaintiff's Fourteenth Amendment Claim

Plaintiff alleges that Defendants violated his Fourteenth Amendment rights by subjecting him to the cross-gender search and by treating him differently based on his race and national origin. As evidence of this, Plaintiff alleges that Defendants commented on his "thick crazy accent" and stated that the fact he is originally from Africa "makes it even worse." Dkt. No. 114

at 15.[4] "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (citation omitted). The Magistrate Judge concluded that the record fails to demonstrate that Defendants treated Plaintiff differently based on his race or national origin. The fact that Defendant Muse noticed Plaintiff's accent and engaged Plaintiff in conversation to determine whether Plaintiff could comprehend and adequately converse during the interview did not establish racial bias. Plaintiff objects to this conclusion by simply restating his conclusory allegations of discrimination. Such conclusory allegations, without more, cannot defeat summary judgment. As such, the Court overrules Plaintiff's objections and adopts the Report and Recommendation as to the Fourteenth Amendment claim.

### 4. Plaintiff's *Monell* Claim

Lastly, Plaintiff alleges that the City of Tacoma had a policy and/or custom that "emboldened" the Defendants to violate his Fourth Amendment rights by conducting the cross-gender search. Municipalities may be held liable as "persons" under § 1983, but not for the unconstitutional acts of their employees based solely on *a respondeat superior* theory. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978). Rather, a plaintiff seeking to impose liability on a municipality under § 1983 is required "to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403, (1997) (citing *Monell*, 436 U.S. at 694). The Magistrate Judge necessarily concluded that the

---

[4] Plaintiff also complains of the conditions he allegedly experienced during the time he was detained prior to the search. Once again, these allegations were addressed and dismissed in *Munywe v. Dier*, WAWD 3:21-cv-5218-BJR, Dkt. No. 54, and will not be addressed again here.

*Monell* claim fails given that Plaintiff failed to present evidence from which a reasonable jury could find a cognizable constitutional violation by any of the individual Defendants.

Plaintiff objects that the Magistrate Judge's conclusion is wrong because "it just ignore[es] Plaintiff's thorough explanation in the response to Defendants' motion for summary judgment." Dkt. No. 114 at 18. Simply referring this Court to arguments Plaintiff previously raised in opposition to the summary judgment is insufficient. Instead, Plaintiff is required to identify the alleged specific errors in Report and Recommendation and having failed to do so, the Court deems this portion of the Report and Recommendation uncontested. *See*, *e.g.*, *Harden v. Ryan* 2013 WL 1908352, *1-*2 (D. Ariz. May 7, 2013) ("Merely reasserting the grounds of the petition as an objection provides this Court with no guidance as to what portions of the R&R Petitioner considers to be incorrect. As such, the Court will deem Petitioner's objections, which are mere recitations of earlier arguments, ineffective."); *Owens v. Commissioner of Social Security*, 2013 WL 1304470, *3 (W.D. Mich. March 28, 2013) (same).

### IV.   CONCLUSION

For the foregoing reasons, the Court HEREBY ADOPTS the Report and Recommendation, GRANTS Defendants' motion for summary judgment, and DISMISSES Plaintiff's claims with prejudice. In addition, this Court concludes that Plaintiff's IFP status should not be granted for purposes of appeal.

Dated this 13th day of February 2023.

_____
Barbara Jacobs Rothstein
U.S. District Court Judge

15